Carlton KNIGHT, Petitioner,

v.

UNITED STATES PAROLE COMMISSION and Arthur Beeler, Warden, Respondents.

No. 88 C 10601.

United States District Court, N.D. Illinois, E.D.

Aug. 29, 1989.

Amended Sept. 14, 1989.

---

Carlton Knight, Chicago, Ill., pro se.

Asst. U.S. Atty. Ann L. Wallace, Chicago, Ill., for respondents; Sharon Gervasoni, Asst. General Counsel, U.S. Parole Com'n, Chevy Chase, Md., of counsel.

## AMENDED MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

Pro se petitioner, Carlton Knight ("Knight"), seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2255. Respondents are Arthur Beeler, the Warden of the Metropolitan Correctional Center ("MCC") in Chicago where Knight is incarcerated and the United States Parole Commission ("Commission"). For the reasons stated below, the petition is denied.

### II. FACTUAL BACKGROUND

The events giving rise to this habeas corpus petition occurred in 1985. In October 1985, Knight was involved in a conspiracy to defraud the brokerage house of Oppenheimer & Co., Inc. ("Oppenheimer"). Knight secured a stolen $150,000 Kemper Financial Services check which was deposited in an Oppenheimer account opened by one of Knight's co-conspirators, Anthony Buchanan, a/k/a Gerald Baker. This check was used to purchase 300 shares of Beatrice stock and 500 shares of Financial Service of Santa Barbara stock. In addition, Knight and his co-conspirators attempted to obtain in excess of $124,000 in gold coins with the proceeds of the check. These events concerning the Oppenheimer scheme and the stolen $150,000 check constituted the first ten counts of an eighteen-count indictment against Knight and his co-conspirators. See Government's Version ("Govt. Ver."), Dec. 11, 1986, at 1–2, 6.

The remaining eight counts of the indictment concerned several unrelated incidents which occurred in 1985 with other stolen

checks. In April 1985, Paul Perry, a/k/a Nathaniel Williams ("Perry"), another of Knight's co-conspirators, opened a savings account at the Home Savings of America Bank ("Home Savings"), 5250 S. Lakepark Ave., Chicago, Illinois. Between April 30, 1985 and July 1, 1985, Perry deposited five stolen U.S. Treasury checks valued in excess of $40,000 into the account and subsequently made withdrawals totalling $40,000. Govt.Ver., at 5. In May, 1985, Perry opened an account at Citicorp Savings, 7 South Dearborn, Chicago, Illinois. Perry used this account to deposit $15,000 in stolen checks. Perry later withdrew the entire $15,000. Govt.Ver., at 6. Thus, the total amount involved in the Home Savings and Citicorp schemes was $55,000. Knight admitted his involvement in the Home Savings scheme, and the Government attributed to Knight involvement in the Citicorp scheme as well. Govt.Ver., at 7. Finally, on November 19, 1985, Knight deposited a stolen $33,448 check into an account at the Hyde Park Bank & Trust Co. in Chicago. Govt.Ver., at 3.

Knight entered into a pre-plea agreement whereby he agreed to plead guilty to Counts One and Eight of the indictment, which were related to the Oppenheimer scheme. Pursuant to this agreement, the Government agreed to dismiss the remaining counts of the indictment following Knight's sentencing. Presentence Report, Dec. 22, 1986, at 2. Thus, Knight pled guilty to conspiracy and wire fraud pursuant to 18 U.S.C. §§ 371 and 1341, respectively. On January 7, 1987, he was sentenced to five years imprisonment. Knight began serving his sentence on April 28, 1987. Special Reconsideration Hearing Review Summary, Dec. 12, 1988. In July, 1987, his sentence was modified to 46 months.

At Knight's initial parole hearing, the hearing panel rated Knight's offense behavior as category four severity, because it found that Knight had committed fraud involving an amount between $40,000 and $200,000. Based on an offense severity rating of four and a salient factor score of seven, the Commission's guidelines established that a range of 20–26 months should be served before release. The Commission accepted the hearing panel's findings and issued a Notice of Action dated March 10, 1988, setting Knight's presumptive parole date at June 28, 1989, a date 26 months after he began serving his sentence.

Knight timely appealed this decision to the National Appeals Board ("NAB"), pursuant to 28 C.F.R. § 2.26. Although Knight had signed his appeal on March 16, 1988, the NAB did not stamp his appeal as received until August 15, 1988. Because Knight did not know the status of his appeal between March and August, he and his wife, Jennifer Knight, contacted the Commission on several occasions during this time. These communications, which were either by telephone or letter, included a letter written by Jennifer Knight dated August 8, 1988.

On October 18, 1988, the NAB sent a Notice of Action on Appeal to Knight informing him that his case had been reopened pursuant to 28 C.F.R. § 2.28(f). The Notice of Action on Appeal stated:

> Based upon a review of your case, it is noted that the offense severity may have been incorrectly rated. Your offense behavior involved a stolen $150,000 check, in addition to $55,000 in stolen checks.

28 C.F.R. § 2.28 provides for the scheduling of a special reconsideration hearing "upon receipt of new and significant adverse information."

On December 7, 1988, the special reconsideration hearing was held. The hearing panel found that Knight was involved in a total of $238,448 in fraudulent checks. This total included the stolen $150,000 check used in the Oppenheimer scheme, the $55,000 in stolen checks used in the Citicorp and Home Savings schemes, and the $33,448 check deposited at the Hyde Park Bank & Trust Co. Special Reconsideration Hearing Review Summary, Dec. 12, 1988. Thus, the Commission recalculated Knight's offense severity as category five, having found Knight participated in fraudulent acts involving a total amount between $200,000 and $1,000,000.

In his petition for habeas corpus, Knight makes three principal arguments.[1] First, Knight argues that the Commission frustrated the intent of the sentencing judge in determining his eligibility for parole. Next, he argues that the delay in processing his appeal violated his due process rights. Finally, Knight argues that there were problems with the special reconsideration hearing. Namely, Knight argues that the Commission violated his due process rights by reopening his case and that the information used in recalculating his offense severity rating was not "new" as required by 28 C.F.R. § 2.28.

## III. DISCUSSION

### A. *Intent of the Sentencing Judge*

Knight argues that the Commission's decision regarding his eligibility for release on parole thwarted the intentions of the sentencing judge. At the time of sentencing, a district court judge is confronted with three possibilities for setting the time of eligibility for release on parole. A judge may impose a sentence pursuant to 18 U.S.C. § 4205(a)[2] which states that a prisoner shall be eligible for parole after serving one-third of his term; a judge may impose a sentence pursuant to 18 U.S.C. § 4205(b)(1) which allows the sentencing judge to set a minimum term to be served, at the expiration of which the prisoner is eligible for parole; or the judge may impose a sentence pursuant to 18 U.S.C. § 4205(b)(2) under which the judge may set a maximum term to be served, allowing the Parole Commission to determine the time for release on parole. Normally, a judge specifies the applicable paragraph of 18 U.S.C. § 4205 on the Judgment and Probation/Commitment Order ("the Judgment Order") when issuing the sentence. However, in Knight's case, the judge did not indicate which paragraph of § 4205 was used.

Knight argues that his sentence was imposed pursuant to 18 U.S.C. 4205(b)(1), since the Judgment Order did not explicitly specify a sentencing statute. Knight also contends that 18 U.S.C. § 4205(b)(1), rather than 18 U.S.C. § 4205(a), more accurately reflects the intentions of the sentencing judge. Presumably, Knight believes that he will be released sooner under a § 4205(b)(1) sentence. In *United States v. Fountain,* 768 F.2d 790, 799 (7th Cir.1985), the court noted that "the apparent purpose [of 18 U.S.C. § 4205(b)(1) ] is to allow release on parole before the earliest date allowed by [18 U.S.C. § 4205(a) ]." Therefore, Knight is correct in assuming that that § 4205(b)(1) creates the possibility of an earlier parole eligibility date. However, § 4205 only makes a prisoner *eligible* for parole and guarantees that the prisoner will be considered for parole by the Commission at a particular time; it does not guarantee an actual release date. *See Kajevic v. Baer,* 588 F.Supp. 1061 (E.D.Mich.1984).

However, the Court still must consider the effect of failing to specify a sentencing statute on the Judgment Order. In order to do this, the Court must interpret the language of 18 U.S.C. § 4205. The Court follows the traditional rules of statutory interpretation, noting particularly that it is the duty of the judiciary "to give effect, if possible, to every clause and word of a statute." *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955).

**1.** This Court has jurisdiction over Knight's petition for habeas corpus although Knight has not appealed the Parole Commission's decision in the reconsideration hearing held on December 7, 1988. Exhaustion of administrative remedies has been held not to be a jurisdictional prerequisite. *Schiselman v. U.S. Parole Comm'n,* 858 F.2d 1232, 1234 n. 1 (7th Cir.1988); *Jackson v. Carlson,* 707 F.2d 943, 949 (7th Cir.), *cert. denied,* 464 U.S. 861, 104 S.Ct. 189, 78 L.Ed.2d 167 (1983); *Anderson v. Miller,* 772 F.2d 375, 377 (7th Cir.1985), *cert. denied,* 475 U.S. 1021, 106

S.Ct. 1210, 89 L.Ed.2d 322 (1986). In any event, the Court need not address the exhaustion issue because the government, by not raising it, has waived it. *Schiselman,* 858 F.2d at 1234 n. 1.

**2.** The Court notes that 18 U.S.C. § 4205 has been repealed. However, § 4205 is still applicable to offenses committed before November 1987 and, therefore, was correctly applied at Knight's sentencing in January 1987.

Section 4205(a) begins with the following language: *"Whenever* confined and serving a definite term or terms of more than one year, a prisoner *shall be eligible* for release on parole after serving one-third of such term or terms...." 18 U.S.C. § 4205(a) (emphasis added). Under section 4205(b)(1), however, a sentencing court, "when in its opinion the ends of justice and best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, *may designate* in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court." 18 U.S.C. § 4205(b)(1) (emphasis added).

■ Knight's view is that § 4205(a) and § 4205(b) each are options which the court must affirmatively choose. However, the statutory language does not comport with that view. The words at the beginning of these two sections are revealing. Whereas § 4205(a) begins with the word "whenever," § 4205(b) begins with a phrase which allows a sentencing court to use discretion "when in its opinion the ends of justice and the best interests of the public require [it]." Therefore, the presumption is that § 4205(a) applies unless the sentencing court has affirmatively exercised its discretion to choose § 4205(b) instead. Further, the verbiage in these sections supports this presumption. The mandatory language in § 4205(a) states that "a prisoner shall be eligible for release on parole." However, § 4205(b)(1) allows a sentencing judge to take some affirmative action and "designate in the sentence of imprisonment imposed a minimum term." In Knight's case, the sentencing judge did not take any affirmative action and designate a minimum term in the Judgment Order; therefore, the Court finds that § 4205(a) applies.

Even assuming, arguendo, the sentencing judge had revealed some intention to show leniency for Knight, this intention would not dictate the ultimate decision of the Commission. Congress has vested the ultimate decision for release with the Pa-role Commission. *Solomon v. Elsea,* 676 F.2d 282, 290 (7th Cir.1982); *Billiteri v. United States Board of Parole,* 541 F.2d 938, 944 (2d Cir.1976). Although a sentencing judge may have certain expectations, a requirement that "the Parole Commission ... act in accordance with judicial expectations ... would substantially undermine the congressional decision to entrust release determinations to the Commission and not with the courts." *United States v. Addonizio,* 442 U.S. 178, 190, 99 S.Ct. 2235, 2243, 60 L.Ed.2d 805 (1979).

Petitioner also alleges that the Parole Commission did not follow the correct procedures in deciding his case because a sentencing statute was never specified. However, the legislative history of 18 U.S.C. § 4205 indicates that the same standards apply to parole proceedings regardless of which sentencing statute has been invoked: "The standards and criteria for parole release are to be made the same for all federal prisoners without regard to which of the three main sentencing alternatives is utilized by the court." S.Rep. No. 369, 94th Cong., 2d Sess. 18, reprinted in 1976 U.S.Code Cong. & Admin.News 335, 340.

### B. *Due Process Violated by Delay*

■ Knight argues that the Parole Commission failed to timely respond to his appeal. Knight cites the literal language of 28 C.F.R. § 2.26(c) in supporting his argument. 28 C.F.R. § 2.26(c) provides: "The National Appeals Board shall act within sixty days of *receipt* of the appellant's papers, to affirm, modify, or reverse the decision ..." (emphasis added). Knight signed his appeal on March 16, 1988. However, the NAB did not stamp the appeal as received until August 15, 1988. Thereafter, the NAB sent a Notice of Action on Appeal on October 18, 1988. Thus, it appears that the NAB acted 64 days after receiving the appeal.

Knight is concerned with the five-month delay beginning on March 16, 1988, when he signed his appeal and ending August 15, 1988, when the NAB stamped the appeal as received. The regulations do not require that the NAB receive an appeal within a

specified period of time. Indeed, that would be an unrealistic requirement. The NAB cannot be responsible for an appeal that is not yet physically within its control. The regulations specifically address only what the NAB must do once it has possession of an appeal. The record does not show whether the NAB had ever received the appeal or simply had not stamped it until August 15, 1988. If the NAB did not receive the appeal until August 15, 1988, Knight's argument carries no weight. However, if the Board actually received the appeal earlier and simply did not stamp it until August 15, 1988, Knight's argument carries more weight and merits additional discussion.

As a practical matter, the Commission cannot wait indefinitely to stamp an appeal once it has been physically received. If so, 28 C.F.R. § 2.26(c) would merely be excess verbiage. Section 2.26(c) gives prisoners an assurance that their appeals will be considered in a timely fashion. In order to give credence to the apparent purpose of § 2.26(c), the Court will treat the possibility that the Commission did not stamp the appeal immediately upon receipt as a failure to follow the express language of § 2.26(c) requiring the Commission to act within sixty days.

Nonetheless, the failure of the Commission to follow administrative rules and regulations alone would not entitle a prisoner to habeas corpus relief. The deviation from the regulations must also involve some constitutional violation. *Turner v. Henman*, 829 F.2d 612, 614 (7th Cir.1987). In this case, Knight alleges that the failure of the Commission to timely respond to his appeal violated his due process rights. However, before the Due Process Clause is applied to this situation, the Court must determine whether Knight had a protectible liberty interest.

In *Solomon v. Elsea, supra*, 676 F.2d at 284, the Court stated: "It is axiomatic that before due process protections can apply, there must first exist a protectible liberty or property interest." *See also Averhart v. Tutsie*, 618 F.2d 479, 480 (7th Cir.1980). Although Knight was not yet at liberty, he alleges that his unit team at the MCC had scheduled him for release on December 23, 1988. Petitioner's Response to Respondent's Motion, Mar. 29, 1989. The record does not contain any information further explaining this alleged release date; however, it is not critical to the Court's analysis. The Court concedes that Knight had at least an expectancy of freedom, whether that freedom was to take place on December 23, 1988, or on Knight's presumptive parole date of June 26, 1989. *See Iuteri v. Nardoza*, 560 F.Supp. 745, 750 (D.Conn. 1983), *aff'd*, 732 F.2d 32 (2d Cir.1984) (prisoner whose incarceration was extended on the eve of his anticipated release has an expectancy of freedom).

An expectation interest may be protected by the Constitution. *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979). The *Greenholtz* court cautioned, however, that whether a statute creates a protectible liberty interest must be decided on a case-by-case basis. *Greenholtz*, 442 U.S. at 12, 99 S.Ct. at 2106. In this instance, the Court need not decide whether the appeal process under 28 C.F.R. § 2.26 creates a protectible liberty interest because, as explained below, Knight's due process rights have not been violated.

Assuming, *arguendo*, that the appeal process under 28 C.F.R. § 2.26 creates a protected interest under the due process clause, the next step in the due process inquiry is whether Knight had an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). The Supreme Court, in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), further refined this "meaningful time and meaningful manner" determination into a four-part test in the context of a defendant's right to a speedy trial. The four *Barker* factors are: the length of the delay, the grounds for the delay, the defendant's avowal of his right, and any prejudice flowing from the delay. 407 U.S. at 530, 92 S.Ct. at 2191. The *Barker* factors are to be considered collectively, as "no single factor is either neces-

sary or sufficient to a finding of a deprivation of a constitutional right." *Hanahan v. Luther*, 693 F.2d 629, 634 (7th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1013 (1983).

The *Barker* factors have been used to decide whether the due process clause has been violated in the context of a delay preceding a parole revocation hearing. *Hanahan*, 693 F.2d at 634; *United States ex rel. Sims v. Sielaff*, 563 F.2d 821, 828 (7th Cir.1977). Although *Hanahan* and *Sielaff* both involved a parole revocation hearing rather than a response following an appeal, the *Barker* factors are applicable to Knight's case. In fact, the liberty interest involved in a parole revocation hearing is greater than the liberty interest involved in the appeal process. Whereas a parole revocation hearing actually revokes a previous right of liberty, an appeal simply determines a future expectation of release. *See Greenholtz*, 442 U.S. at 9, 99 S.Ct. at 2105 (distinguishing between liberty on parole and mere expectation of release).

As previously noted, there was a five-month delay between the time Knight signed the appeal and the NAB stamped the appeal as received. In *Sielaff*, the Seventh Circuit found that a three-month delay preceding a parole revocation did not automatically create a presumption of prejudice. 563 F.2d at 827, relying on *Moody v. Daggett*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). In fact, the *Sielaff* court relied on *Barker, supra*, to state that a rigidly specified time period could not be used as a delimiter separating what is reasonable from what is not; rather, any determination of prejudice must be made on a case-by-case basis. 563 F.2d at 828. Because analysis of the length of the delay in Knight's case yields no clear-cut due process violation, the Court proceeds to consider the other *Barker* factors.

Determining the reason for the delay in Knight's case is problematic. Nothing in the record sheds any light on this problem. As the Court noted previously, the reasons for the delay could be that the Commission never received the appeal, the Commission misplaced the appeal, or the Commission acted in bad faith in failing to stamp the appeal. However, the Court finds no direct evidence of bad faith on the part of the Commission. Once the Commission did take action, it complied with all due process requirements in conducting the hearing.

Although Knight did contact the Commission regarding the status of his appeal on several occasions, the Court finds no prejudice resulting from the delay. Knight claims that he was prejudiced in that his seven-year-old daughter experienced emotional problems as a result of the delay. Response to Respondent's Motion, Mar. 28, 1989. In *Barker*, the Court further subdivided the prejudice element into three interests in the context of a speedy trial right: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2192. *See also Hanahan v. Luther*, 693 F.2d at 635. The first two interests seem to speak to the incarcerated individual's own interest; they do not extend to the interests of the prisoner's family. In fact, in *Iuteri v. Nardoza, supra*, 560 F.Supp. at 751, the court quickly disposed of an individual's private interest implicated as the result of a delay. The *Iuteri* court stated that "the magnitude of the deprivation caused by the decision to postpone release to allow the Commission to reevaluate the inmate's parole potential in light of the new information has been deemed minimal and therefore the impact of official action on private interests is also minimal." 560 F.Supp. at 751. Therefore, the Court finds that Knight's own interests were not prejudiced. The third interest identified in *Barker* speaks to the availability of a defense, which courts have considered in the situation where there is a potential for a loss of testimony. *See, e.g., Hanahan v. Luther*, 693 F.2d at 635 (absence of testimony was not prejudicial in specific instance); *Poynor v. U.S. Parole Comm'n*, 878 F.2d 275, 276–77 (9th Cir.1989) (stressing the importance of showing prejudice). However, Knight does not argue that his defense was in any way impaired.

Having considered all of the *Barker* factors, the Court finds that Knight's due process rights were not violated as the result of the delay in the appeal process.

### C. *Special Reconsideration Hearing*

**1. Commission's Authority to Reopen under § 2.28**

█ Knight argues that the Commission unjustifiably reopened his case under 28 C.F.R. § 2.28(f) and thereby violated his due process rights. However, under the plain language of § 2.28(f) the Regional Commissioner is authorized to schedule the case for a special reconsideration hearing. *See also Williams v. United States Parole Commission,* 707 F.2d 1060, 1064 (9th Cir. 1983) (noting the authority of the Regional Commissioner to reopen cases). Therefore, this argument, without more, does not establish a violation of Knight's due process rights.

**2. "New, Adverse Information"**

Finally, Knight argues that the information used in reassessing his offense severity at the special reconsideration hearing on December 7, 1988, was not new adverse information under 28 C.F.R. § 2.28(f). Knight, in his petition, did not explicitly state what information he believed failed to fall within the meaning of "new" under § 2.28. However, the Government, in its Motion to Dismiss the Petition, centered its § 2.28 discussion around the $150,000 check used in the Oppenheimer scheme. The Government relied on the Notice of Action dated October 18, 1988, which indicated that Knight's offense severity may have been incorrectly rated because his "offense behavior involved a stolen $150,000 check, *in addition* to $55,000 in stolen checks." Notice of Action, Oct. 18, 1988 (emphasis added). Thus, the Government inferred that at Knight's initial parole hearing, only the $55,000 in stolen checks and not the $150,000 check were used in rating Knight's offense severity as category four.

█ Information can still be new under the meaning of § 2.28(f) even though it existed at the time of the initial parole hearing. *Schiselman v. U.S. Parole Comm'n,* 858 F.2d 1232, 1238 (7th Cir. 1988); *Goble v. Matthews,* 814 F.2d 1104, 1108 (6th Cir.1987); *Fardella v. Garrison,* 698 F.2d 208 (4th Cir.1982); *McClanahan v. Mulcrome,* 636 F.2d 1190 (10th Cir.1980); *Williams v. U.S. Parole Comm'n,* 707 F.2d at 1065. However, in *Schiselman,* the Seventh Circuit made a distinction between information which merely existed at the time of the initial parole determination hearing and information which was considered and expressly disregarded by the Parole Commission. 858 F.2d at 1238. If the information had been previously disregarded by the Parole Commission, the Seventh Circuit held that it could not be considered new within the meaning of § 2.28. *Id.* at 1239.

In the present case, the hearing summary for Knight's initial parole hearing was not part of the record. Therefore, this Court was unable to determine whether the $150,000 check had been considered in the initial parole hearing. Thus, this Court *sua sponte* issued a minute order dated July 10, 1989 requesting the Government to supplement the record with additional information concerning Knight's initial parole hearing. In response to the minute order, the Government supplied the Court with a Prehearing Assessment and the Initial Hearing Summary relating to Knight's initial parole hearing held on February 19, 1988.

The Court found the information contained in the Prehearing Summary dated January 22, 1988 disturbing. The Prehearing Assessment stated that "Mr. Knight and his accomplices stole a $150,000 check...." Juxtaposed with this mention of the $150,000 check was the following statement: "The offense behavior is rated as category Four severity because it includes between $40,000 and $200,000 worth of fraud." Thus it appeared that only the $150,000 check, rather than the $55,000 in stolen checks, was considered.

The Court then issued a second minute order on July 19, 1989 directing the Government to "substantiate its claim that the $150,000 check is 'new, adverse information.'" The Government, in its re-

sponse dated July 21, 1989, admitted that it had erroneously urged in its first brief that the special reconsideration hearing was held to consider the $150,000 check and not the $55,000 in stolen checks. In correcting its position, the Government stated that the $55,000 in stolen checks was the "new, adverse information" considered at the special reconsideration hearing. Thus, the Court must determine whether the $55,000 in stolen checks was indeed "new, adverse information."

This Court is only authorized to review a parole determination if that determination constitutes an abuse of discretion. *Solomon v. Elsea*, 676 F.2d at 290. This Court's inquiry on review "is not whether the Commission's decision is supported by a preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons." *Id.* at 290; *Schiselman*, 858 F.2d at 1237.

The *Schiselman* court held that the Parole Commission abused its discretion by relying on information in a later hearing that it had expressly chosen to disregard previously. 858 F.2d at 1238–1239. It concluded that the Parole Commission explicitly accorded no weight to certain pieces of information by referring to the following statement in a hearing summary: "The Panel does not see these factors as being indicating factors...." 858 F.2d at 1238.

In the present case, unlike the situation in *Schiselman*, there is no evidence that the hearing panel chose to disregard information about the $55,000 in stolen checks.

To the contrary, there are many indications that the panel only considered the $150,000 check at Knight's initial hearing. First, the Prehearing Assessment for Knight's initial parole hearing refers to the $150,000 check alone. In addition, immediately under this reference, Knight's offense severity is rated as category four because it involves fraud between $40,000 and $200,000. Prehearing Assessment, Jan. 22, 1988. Second, the Initial Hearing Summary notes "that this instant offense behavior occurred between October 4 and October 24, 1985." Initial Hearing Summary, Mar. 1, 1988. These dates reflect Knight's involvement with the $150,000 check and the Oppenheimer scheme in October 1985. Finally, a memorandum dated October 5, 1988, which immediately preceded the October 18, 1988 Notice of Action on Appeal, reaffirms that only the $150,000 check had been previously considered. This memorandum brings the $55,000 in stolen checks to the attention of the Commission by stating that Knight was "*also* involved in an *additional* $55,000 [sic] stolen checks." *See* Exhibit A attached to Government's "Court Ordered Response to *Minute Order Dated July 19, 1989*", July 21, 1989 (emphasis added).[3]

---

3. This memorandum also states the following: "Based on a review of your case, it is noted that the offense severity has been incorrectly rated. Your offense behavior involved a stolen $150,-000 check, in addition to $55,000 in stolen checks." Exhibit A attached to "Court Ordered Response to *Minute Order Dated July 19, 1989*", July 21, 1989 ("Analyst's Memorandum"). Thus, it appears that this statement was copied verbatim onto what the Government has termed the "inartfully worded" Notice of Action on Appeal dated October 18, 1988. *See* Court Ordered Response to *Minute Order Dated July 19, 1989.* The Court agrees that this Notice of Action was inartfully worded and notes that this wording was perpetuated despite the fact that three different persons signed off on the Analyst's Memorandum on October 11, 1988, October 13, 1988, and October 14, 1988. The court in *Schiselman* carefully considered the effect of a typographical error in a Notice of Action. 858 F.2d at 1235 (discussing an earlier unpublished opinion

of *Schiselman* at 805 F.2d 1038 (7th Cir.1986) (Table)). The court's ultimate response was to grant the writ of habeas corpus unless the petitioner received a new hearing. In the instant case, however, the Court finds that a new hearing would be a fruitless exercise, because Knight has admitted his involvement with the $55,000 in checks. Response to Respondent's Motion, March 28, 1989 ("$55,000 theft committed"). In addition, the consideration of the $55,-000 in stolen checks at Knight's initial parole hearing "would have resulted in a different decision." *See Schiselman*, 858 F.2d at 1239. While the Court agrees that the confusion which this "inartfully worded" Notice of Action has engendered is unfortunate, the Court is cognizant of the law which holds that Knight has no right to an error-free determination of his eligibility for release on parole. *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Sadiqq v. Bramlett*, 559 F.Supp. 362

■ Despite Knight's contentions that he never admitted to involvement in fraud over the amount of $200,000, the Court finds that there is a rational basis in the record for the Commission's decision. The Commission based its decision on Assistant U.S. Attorney T. Mullen's "GOVERNMENT'S VERSION" and the Presentence Report. The Commission found that Knight conspired to commit fraud in the amount of $238,000. This total included the $150,000 check, a $33,448 check, a $40,-100 series of withdrawals, and a total of $15,000 in checks (the $40,000 and $15,000 totalling the $55,000 in dispute). Special Reconsideration Hearing Review Summary, Dec. 12, 1988.[4] Therefore, there is a rational basis for the Commission's finding of Knight's offense severity as category five.[5] Accordingly, this Court gives deference to the Commission's finding and holds that the Commission did not abuse its discretion.

Knight also argues that the $150,000 amount is not correct. However, the Parole Commission may consider a wide variety of information in determining whether to release a prisoner on parole. Specifically, 18 U.S.C. § 4207 provides a laundry list of the sources of information the Commission may consider, including presentence reports and "such additional relevant information concerning the prisoner ... as may be reasonably available." Because the information considered by the Commission has not always been proved in an adversary setting, there may be some dispute about the accuracy of portions of the information. Therefore, the prisoner is given notice of what information will be used and an opportunity at the hearing to respond to the information. *See* 18 U.S.C.

§ 4208(b)(2), § 4207, and § 4208(e). If a dispute remains about the accuracy of the information, the Commission is required to resolve the dispute based on the preponderance of the evidence standard. In other words, "the Commission shall rely upon such information only to the extent that it represents the explanation of the facts that best accords with reason and probability." 28 C.F.R. § 2.19(c).

■ In the present case, Knight was present at the special reconsideration hearing. The Special Reconsideration Review Summary dated December 12, 1988 states: "The prisoner was questioned as to his understanding of the offense [sic] and he confirmed that he was involved with the $150,000 check ..." In addition, the Panel reviewed the information in the Government's Version. This report, in part, states: "Knight was responsible for securing the [$150,000] check ..." Govt.Ver., at 6. Therefore, the Panel found, based on a preponderance of the evidence, that Knight was involved in a total of $238,448 in fraudulent checks.

However, Knight specifically argues that the Commission construed 28 C.F.R. § 2.20 Chapter 3, Subchapter D incorrectly. Knight urges that the Commission should have calculated his total theft using the $124,000 value of the gold coins rather than the $150,000 value of the check. In construing an administrative regulation, the Court must give deference to the administrative interpretation. Unless this interpretation is plainly erroneous, it is controlling. *McClanahan v. Mulcrome, supra,* 636 F.2d at 1191. In this case, the Court finds that the administrative interpretation was not plainly erroneous.[6]

(N.D.Ga.1983); *McClanahan v. Mulcrome,* 636 F.2d 1190, 1191 (10th Cir.1980).

**4.** Moreover, the Probation Officer in his Presentence Report had independently calculated Knight's offense severity as category five. Presentence Report, Dec. 22, 1986, at 9.

**5.** Knight also contends that the actions of the Parole Commission violated his equal protection rights. Because Knight's equal protection challenge to the Parole Commission's action does not involve a suspect classification or a fundamental right, *see Greenholtz,* 442 U.S. 1, 8–12, 99

S.Ct. 2100, 2104–05, it must "be rejected unless the agency's action is patently arbitrary and bears no rational relationship to a legitimate governmental interest." *Young v. U.S. Parole Comm'n,* 682 F.2d 1105, 1109 (5th Cir.1982). Because this Court has found that there was a rational basis for the Commission's actions, Knight's equal protection challenge is rejected.

**6.** The Court notes that the $150,000 check was not only used in an attempted scheme to obtain the gold coins; Knight and his co-conspirators also used the proceeds of the check to actually

## IV. CONCLUSION

For the reasons stated herein, the Court denies Knight's request for a writ of habeas corpus.

purchase 300 shares of Beatrice stock and 500 shares of FSB stock. Govt.Ver., at 1–2.